**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In re: Bank of America Fraudulent Account Litigation** | **MDL No.** |

**BRIEF IN SUPPORT OF MOTION FOR TRANSFER AND
COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. §1407**

I.     **Introduction**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Movant-Plaintiff Charles F. Barrett ("Barrett" or "Plaintiff"), respectfully moves the Judicial Panel on Multidistrict Litigation ("Panel") to transfer and centralize the actions listed in the Schedule of Actions (collectively, the "Actions"), and any subsequent tag-along actions, to the Honorable Waverly D. Crenshaw, Jr., United States District Court Judge for the Middle District of Tennessee, who currently presides over the putative class action brought by Barrett against Bank of America Corporation and Bank of America, N.A. ("Defendants" or "BOA"), for coordinated or consolidated pretrial proceedings.

II.     **Background**

Bank of America operates in all 50 states and the District of Columbia. In September 2022, Bank of America, N.A. had over $3.1 trillion in total assets.  Bank of America offers an array of financial products and services to consumers, including credit cards.

Until January 1, 2023, Bank of America formally evaluated its employees' overall performance and incentive compensation by considering, among other factors, the number of new products or services that employees had sold to Bank of America customers.  Pressured to increase sales in order to keep their jobs or earn incentive bonuses, Bank of America's employees submitted applications for and issued credit cards without consumers' knowledge or consent.

When a consumer applies for a credit card, Bank of America obtains consumer reports (i.e., credit reports) on the applicant. When a potential lender obtains a credit report for the purpose of determining a consumer's creditworthiness, this activity is noted on future credit reports and negatively affects a consumer's credit rating (i.e., the credit score). During the process of applying for credit cards without consumers' knowledge or consent, Bank of America would sometimes use or obtain consumer reports. Bank of America had no permissible purpose for obtaining these reports. Obtaining these reports had a negative impact on the consumers whose reports were obtained.

Bank of America benefitted from these accounts created without consumers' knowledge or consent because, among other things, Bank of America collected fees on those accounts.

Bank of America's conduct was investigated by the Consumer Financial Protection Bureau ("CFPB"), which determined that this conduct violated Truth in Lending Act, the Fair Credit Reporting Act, and the Consumer Financial Protection Act. On July 10, 2023, Bank of America settled with the CFPB and agreed to pay a civil penalty of $30 million and to provide redress to affected customers.

Although Bank of America contends that it no longer imposes sales goals on the employees primarily responsible for consumer credit card accounts, this addresses only one cause of the issuance of credit cards without consumers' knowledge or consent. Moreover, the elimination of sales goals for purposes of formal performance evaluations and bonus eligibility does not necessarily mean that Bank of America does not consider employees' sales volume when making employment decisions.

Bank of America's actions have harmed impacted consumers. This harm includes being charged fees by Bank of America on the credit cards, being put into collections for failure to pay

fees accruing without customers' knowledge, losing control over their personal identifying information, spending time and effort to investigate the facts and seeking to close unwanted accounts, and having to more carefully monitor their credit going forward, including through costly identity theft protection services.  Consumers' credit ratings are also negatively affected when Bank of America pulls their credit reports as well as if consumers incur fees or other charges on the accounts opened without their knowledge or consent. As a result of lowered credit ratings, consumers face greater difficulty in finding jobs and obtaining credit, including car loans and mortgages.

Although purportedly the unwanted credit card accounts constituted a small percentage of Bank of America new accounts, the size of Bank of America means that a small percentage is still a large number of accounts in absolute terms.

All of the Actions assert similar claims stemming from BOA's unauthorized opening of accounts.  While the various Actions may contain different state law claims, they all arise from the same course of conduct and share key core factual and legal questions:

(a)     Whether BOA issued credit cards to consumers without their knowledge or consent;

(b)     Whether BOA accessed consumers' credit reports during the process of applying for credit cards without consumers' knowledge or consent;

(c)     Whether BOA had any permissible purpose for accessing consumers' credit reports during the process of applying for credit cards without consumers' knowledge or consent;

(d)     Whether accessing a consumer's credit report for purposes of an application for a credit card negatively impacts that consumer's credit rating;

(e)     Whether BOA's sales quota policies encouraged employees to apply for and issue credit cards to consumers without their knowledge or consent;

(f)     Whether the benefits obtained by BOA employees from BOA as a result of applying for and obtaining credit cards without the employees' knowledge or consent constitute an unlawful economic benefit;

(g)     Whether BOA earned fees on credits cards issued without consumers' knowledge or consent;

(h)     Whether the fees obtained constitute an unlawful economic benefit to BOA;

(i)     Whether BOA continues to consider employees' sales volume when making employment decisions;

(j)     Whether BOA account holders were charged fees associated with credit cards issued without their knowledge or consent;

(k)     Whether issuing credit cards without consumers' knowledge or consent constitutes an unfair or deceptive trade practice;

(l)     Whether BOA acted willfully or knowingly when issuing credit cards without consumers' knowledge or consent;

(m)     Whether BOA employees engaged in unfair, deceptive, or misleading practices when applying for credit cards without consumers' knowledge of consent;

(n)     Whether BOA had a duty not to issue credit cards without consumers' knowledge or consent; and

(o)     Whether BOA was unjustly enriched by obtaining fees from Plaintiff and other consumers to whom credit cards were issued.

These central questions are too important to the thousands BOA account holders to leave their determination to numerous courts across the country that could reach divergent and conflicting results. Moreover, simply because the plaintiffs who have filed suit may have different damages does not weigh in favor of denying centralization. *See In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 363 F. Supp. 3d 1378, 1381–82 (J.P.M.L. 2019) (centralizing consumer claims for economic damages with personal injury claims).

Legally, the purpose of centralizing these cases is to promote the just and efficient litigation of these actions, to avoid inconsistent rulings on key and fundamental issues, and to prevent duplicative discovery or other inefficiencies that would threaten to drain judicial resources. It is not necessary that the cases be identical or that common issues predominate; all that is required are

enough common questions to warrant coordination or consolidation. Federal judges are well equipped to manage centralization in cases where there are substantial differences and complexities. Often, the more complicated and voluminous situations confirm the strengths of centralization, where skilled judges can work with experienced counsel to create plans for moving otherwise seemingly complex and overwhelming cases to an efficient and successful resolution.

While Defendant's conduct has caused damage and unquestionably impacted consumers in many states, the Middle District of Tennessee would be an excellent and appropriate forum for this litigation. It is easily accessible, and it is centrally located among the three districts with pending actions (the Western District of North Carolina, the Middle District of Tennessee, and the Northern District of Illinois). The Middle District of Tennessee has had vast experience successfully managing multidistrict litigation as described more fully below.  Transfer to the Middle District of Tennessee for consolidated or coordinated pretrial proceedings before the Honorable Waverly D. Crenshaw, Jr., Chief United States District Court Judge for the Middle District of Tennessee, is warranted.

## III.   Argument

### A.   TRANSFER OF THE ACTIONS TO ONE COURT FOR COORDINATION OR CONSOLIDATION IS APPROPRIATE UNDER 28 U.S.C. § 1407.

Transfer is appropriate when actions pending in different judicial districts involve similar questions of fact such that coordinating or consolidating pretrial proceedings would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. In relevant part, Section 1407 provides as follows:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict

> litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

*Id.*; *see also In re Nifedipine Antitrust Litig.*, 266 F. Supp. 2d 1382, 1382 (J.P.M.L. 2003). The purpose of multidistrict litigation is to "eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968); *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017) (same); *In re Cap. One Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d 1364, 1365 (J.P.M.L. 2019) (same).

Pursuant to 28 U.S.C. § 1407, transfer of actions to one district for coordinated or consolidated pretrial proceedings is appropriate where: (1) actions pending in different districts involve one or more common questions of fact, and (2) the transfer of such actions will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions. 28 U.S.C. § 1407(a); *Ethicon Physiomesh*, 254 F. Supp. 3d at 1382 (holding that transfer of related actions to a single district for pretrial proceedings "conserve[s] the resources of the parties, their counsel, and the judiciary"); *Capital One Customer Data Sec. Breach*, 396 F. Supp. 3d at 1365 (same). Consolidation is especially important in litigations where "the potential for conflicting, disorderly, chaotic" action is greatest. *Plumbing Fixture Cases*, 298 F. Supp. at 493.

Consolidation of actions involving common factual questions makes sense when numerous judges will be asked to address similar pretrial matters and resolve similar pretrial motions involving similar fact patterns. *See In re Fosamax Prods. Liab. Litig.*, 444 F. Supp. 2d 1347, 1349 (J.P.M.L. 2006). Notably, "[t]ransfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer. Centralization will

permit all actions to proceed before a single transferee judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007).

Here, there are already the following seven pending federal actions in three different districts and presumably many more to come:

- *Barrett v. Bank of America Corp., et al*, No. 3:23-cv-00764 (M.D. Tenn.) (filed July 27, 2023)
- *Ballard, et al. v. Bank of America, N.A., et al.*. No. 3:23-cv-422-MOC-DCK (W.D.N.C.) (filed July 13, 2023)
- *Magers, et al. v. Bank of America, N.A., et al.*, Case No. 3:23-cv-459 (W.D.N.C.) (filed July 25, 2023)
- *Christensen v. Bank of America, N.A*., No. 3:23-cv-00468 (W.D.N.C.) (filed July 27, 2023)
- *Jones, et al. v. Bank of America, N.A., et al.*, No. 3:23-cv-00491 (W.D.N.C.) (filed August 4, 2023)
- *Schak v. Bank of America, N.A., et al*., No. 1:23-cv-06127 (N.D. Ill.) (filed August 25, 2023)
- *Stripling, et al, v. Bank of America, N.A*., No. 1:23-cv-06829 (N.D. Ill.) (filed September 1, 2023)

Inconsistent judicial rulings in litigation affecting thousands of consumers who purchased the Products and have been subjected to an unreasonable risk of harm is precisely the type of disorderly and chaotic action that consolidation and coordination under Section 1407 was intended to prevent. This is especially true where, as here, the actions assert claims on behalf of identical or overlapping classes brought by different counsel. *See, e.g.*, *In re Discover Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1341, 1342 (J.P.M.L. 2011). The transfer of the Actions to the Middle District of Tennessee for consolidated or coordinated proceedings is appropriate because common questions of fact exist, and consolidation or coordination before one court will ensure efficient management of the litigation and avoid inconsistent rulings on these issues impacting so many plaintiffs across the United States.

7

1.      **The Actions Involve Common Factual Questions.**

Here, all of the Actions and any tag-along actions will require a determination of whether Defendant's conduct was deceptive, unfair, fraudulent, negligent, unjust, and constituted a violation of consumer protection laws.  Section 1407 does not require a majority of common factual issues as a condition for transfer, only that there are common questions presented which justify consolidation and coordination. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005) ("To those defendants opposing transfer because they wish to litigate the arguably narrower or more questionable claims against them without entanglement in a litigation that they consider to be much broader in scope, we point out that transfer under Section 1407 does not require a complete identity or even majority of common factual issues as a prerequisite to transfer."). In this case, the facts surrounding Defendant's conduct in opening unauthorized accounts applies equally to all plaintiffs.

The fact that the Actions are based on various state law claims for damages does not preclude consolidated or coordinated discovery because the central factual issues – whether BOA opened unauthorized accounts thereby harming consumers – will be the same across all cases. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) ("Although individualized factual issues may arise in each action, such issues do not – especially at this early stage of litigation – negate the efficiencies to be gained by centralization. The transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims. The alternative of allowing the various cases to proceed independently across myriad districts raises a significant risk of inconsistent rulings and inefficient pretrial proceedings."); *In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) ("While there will be some unique questions of fact from bank-to-bank, these actions share sufficient factual questions relating

to industry-wide bank posting policies and procedures to warrant centralization of all actions in one MDL docket."). The Panel and transferee courts have routinely dealt with complexities, including plaintiffs with varied claims and injuries. *See, e.g., Checking Account Overdraft*, 626 F. Supp. 2d at 1335; *National Prescription Opiate*, 290 F. Supp. 3d at 1379; *cf. In re Silicone Gel Breast Implants Prod. Liab. Litig*., 793 F. Supp. 1098, 1099-1100 (J.P.M.L. 1992) (transfer and centralization of claims against multiple defendants by plaintiffs claiming different injuries); *In re Orthopedic Bone Screw Prod. Liab. Litig*., MDL No. 1014, 1997 WL 186325, at *1–2 (E.D. Pa. Apr. 16, 1997) (more than 2,000 civil actions including claims of different types of injuries caused by products manufactured by dozens of defendants).

What is important and relevant to the Panel's decision is that transfer and consolidation or coordination will provide a consistent and uniform resolution to the common factual issues, which will facilitate the efficient adjudication of all the Actions even considering any differences that may exist. "[T]ransfer under Section 1407 has the salutary effect of placing all actions in th[e] docket before a single judge who can formulate a pretrial program that: (1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; and (2) ensures that pretrial proceedings will be conducted in a manner leading to a just and expeditious resolution of the actions to the benefit of not just some but all of the litigation's parties." *Ins. Brokerage Antitrust*, 360 F. Supp. 2d at 1372 (internal citation omitted); *see also Checking Account Overdraft*, 626 F. Supp. 2d at 1335. The common questions of fact that are implicated here weigh heavily in favor of consolidation and coordination.

        **2.**      **Transfer Will Serve the Convenience of the Parties and Witnesses and Will Promote the Just and Efficient Conduct of the Actions.**

According to the Manual for Complex Litigation, the following four factors govern whether transfer will facilitate the convenience of the parties and promote the just and efficient conduct of the transferred cases:

1.    The elimination of duplicative discovery;

2.    The avoidance of conflicting rules and schedules;

3.    The reduction of litigation cost; and

4.    The conservation of the time and effort of the parties, attorneys, witnesses, and courts.

Manual for Complex Litigation (Fourth), § 20.131, at 219.

In this litigation, there are currently seven pending Actions in three different districts but those numbers are sure to rise. Each Action involves virtually identical factual questions regarding Defendants' conduct, and overlapping issues exist concerning plaintiffs' damages. Consolidation or coordination will eliminate the likelihood of duplicative discovery and proceedings that might result in inconsistent rulings and will prevent judicial resources from being needlessly wasted. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005); *see also In re Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. 696, 698 (J.P.M.L. 1995) (concluding that consolidation was necessary to eliminate inconsistent pretrial rulings); *In re A.H. Robins Co. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406 F. Supp. 540, 542 (J.P.M.L. 1975) (concluding that transfer was necessary to prevent duplication of discovery and to eliminate the possibility of conflicting pretrial rulings).

Without transfer, coordination, and/or consolidation of the Actions and tag-along cases, litigation will needlessly entail judicial inefficiency and unnecessary expense. Further, different federal courts, in duplicating rulings on the same issues, could make contradictory findings. The

fact that each of the actions are putative class actions heightens this risk. Litigation of this scope and importance should not be beset with such inconsistencies and inefficiencies.

    **B.**    **THE MIDDLE DISTRICT OF TENNESSEE IS THE APPROPRIATE FORUM FOR TRANSFER AND COORDINATION OR CONSOLIDATION.**

Bank of America maintains approximately 18 locations in Tennessee.[1] The Middle District of Tennessee is geographically central and accessible forum, especially for the three districts currently at issue (the Northern District of Illinois, the Middle District of Tennessee, and the Western District of North Carolina). The Panel has taken geographic centrality and ease of access into consideration as weighing in favor of a particular transferee forum.[2] The Middle District of Tennessee, and Nashville, Tennessee, is easily accessible by plane from any location and has ample accommodations for business travelers. The size of the city and infrastructure is certainly in place to host this MDL.

Further, the Middle District of Tennessee has capable staff with a long history of successfully managing high-profile multidistrict litigation. The Middle District of Tennessee's docket demonstrates that the court has the capacity to handle this litigation. As of December 31, 2021, the Middle District of Tennessee had 1,503 pending cases[3] with a median time from filing to disposition of 10.8 months.[4]

---

[1] https://locators.bankofamerica.com/tn/ (last visited 9/12/2023)
[2] *See* Transfer Order in *In re Teflon Products Liability Litigation*, MDL No. MDL No. 1733, No. 4:06-md-01733.
[3] U.S. District Courts – Civil Cases Commenced, Terminated, and Pending During the 12 Month Period Ending December 31, 2021 (available at: stfj_c1_1231.2021.xlsx (live.com)
[4] U.S. District Courts – Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending December 31, 2021 (available at: stfj_c5_1231.2021.xlsx (live.com)

Within the Middle District of Tennessee, United States District Judge Crenshaw is an excellent jurist who can shepherd this litigation. Judge Crenshaw is the Chief Judge of the Middle District of Tennessee and presides over Movant's case.  Judge Crenshaw is an experienced jurist who was appointed to the bench by President Barack Obama in 2016. On April 15, 2017, he became the Chief Judge of the Middle District of Tennessee.  Judge Crenshaw is a fair, demanding but reasonable, extremely organized, and efficient judge accustomed to presiding over complex and multi-plaintiff, multi-defendant cases.  *See, e.g.*, *In re Real Page, Inc., Rental Software Antitrust Litig. (No. II)*, MDL No. 3071) 2023 WL 2875737 (J.P.M.L. 2023) (assigning case to Judge Crenshaw).

## IV.     Conclusion

For these reasons, Movant respectfully requests that the Panel grant its motion for transfer and coordination or consolidation under 28 U.S.C. § 1407 and transfer the Actions to the Middle District of Tennessee before the Honorable Waverly D. Crenshaw, Jr., United States District Court Judge for the Middle District of Tennessee.

Dated: September 13, 2023                      Respectfully submitted,

*/s/ Charles J. LaDuca*

Charles J. LaDuca
Alexandra Warren
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW Suite 200
Washington, D.C. 20016
Telephone: (202) 789-3960
charles@cuneolaw.com
awarren@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive
St. Louis, Missouri 63141
Washington, D.C. 20016

Telephone: (314) 226-1015
mflannery@cuneolaw.com

Katherine Barrett Riley
**BARRETT LAW GROUP, PA**
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
Fax: 662-834-2628
kbriley@barrettlawgroup.com

John "Don" W. Barrett
David McMullan
Sterling Aldridge
**BARRETT LAW GROUP, PA**
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
Fax: 662-834-2628
dmcmullan@barrettlawgroup.com
saldridge@barrettlawgroup.com
dbarrett@barrettlawgroup.com

Warren T. Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
wburns@burnscharest.com

Korey A. Nelson
Amanda K. Klevorn
Patrick D. Murphree
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70115
Telephone: (504) 779-2845
knelson@burnscharest.com
aklevorn@burnscharest.com
pmurphree@burnscharest.com

***Counsel for Plaintiff and the Proposed Class***